# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MICHAEL H. HOLLAND, MICHAEL W. BUCKNER, A. FRANK DUNHAM and ELLIOT A. SEGAL, as TRUSTEES OF THE UNITED MINE WORKERS OF AMERICA 1992 BENEFIT PLAN, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:06-cv-00178-RMU |
| v. | ) ) | |
| VALLEY SERVICES, INC. | ) ) | |
| and | ) ) | |
| BIBEAU CONSTRUCTION COMPANY, INC., 231 S. Middletown Road Nanuet, NY 10954 | ) ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANT BIBEAU CONSTRUCTION COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rules 7 and 56.1, Defendant Bibeau Construction Company, Inc., by counsel, hereby moves this Court for an Order granting summary judgment in its favor on all of Plaintiffs' claims. Defendant submits the attached Memorandum of Points and Authorities, exhibits, and declarations, in support of its Motion for Summary Judgment.

Respectfully submitted,

_____/s/_____

John R. Woodrum
D.C. Bar # 933457
OGLETREE, DEAKINS, NASH, SMOAK,
    & STEWART
2400 N Street, N.W.
Fifth Floor
Washington, D.C. 20037
Telephone: (202) 887-0855

*Attorney for Defendant Bibeau Construction
Company, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MICHAEL H. HOLLAND, MICHAEL W. BUCKNER, A. FRANK DUNHAM and ELLIOT A. SEGAL, as TRUSTEES OF THE UNITED MINE WORKERS OF AMERICA 1992 BENEFIT PLAN, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:06-cv-00178-RMU |
| v. | ) ) ) | |
| VALLEY SERVICES, INC. | ) ) | |
| and | ) ) | |
| BIBEAU CONSTRUCTION COMPANY, INC., 231 S. Middletown Road Nanuet, NY  10954 | ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT BIBEAU CONSTRUCTION COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Civil Rules 7 and 56.1, Defendant Bibeau Construction Company, Inc., by counsel, submits this Memorandum of Points and Authorities in Support of its Motion for Summary Judgment.

### INTRODUCTION

In this case the Trustees of the United Mine Workers of America 1992 Benefit Plan ("Trustees" or "1992 Plan") allege that Defendant Bibeau Construction Company, Inc. ("Bibeau Construction") owes the 1992 Plan more than $120,000 in premiums dating back to 1993, plus interest and liquidated damages, on behalf of Arthur Marcum, Jr. and his dependent child.  Mr. Marcum's last employment under a UMWA labor contract was with Valley Services, Inc.

("Valley Services") in September 1979. Putative unserved Defendant Valley Services went out of business shortly thereafter and dissolved and completely distributed its assets approximately twenty-five years ago. In 1995 the United Mine Workers of America 1974 Pension Plan ("UMWA Pension Plan") awarded Mr. Marcum a disability pension with an effective date retroactive to September 1, 1988.

Valley Services was signatory to the National Bituminous Coal Wage Agreement of 1978 ("NBCWA") at the time it ceased operations. The 1978 NBCWA required an employer to provide health benefits for its employees and retirees during the term of the Agreement, but not after it expired. *District 29, UMWA v. Royal Coal Co.*, 768 F.2d 588 (4th Cir. 1985). Thus, even if Mr. Marcum's pension had been awarded during the term of the 1978 NBCWA, Valley Services would have been under no contractual or other legal obligation to provide him with health care benefits after the 1978 NBCWA expired.

In 1992 Congress enacted the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701-9722 ("Coal Act" or "Act"), to address problems that had arisen in the collectively bargained system for providing health benefits to United Mine Workers of America ("UMWA") retirees. Among other things, the Coal Act created the 1992 Plan, and directed its Trustees to enroll and provide health benefits to certain UMWA retirees and their dependents. 26 U.S.C. § 9712(b). The Coal Act guaranteed funding sources for the health benefits provided by the 1992 Plan. 26 U.S.C. § 9712(d)(1). Among other things, the Act authorized the Trustees to assess any former employer a monthly premium for each retiree (and dependent) receiving benefits from the 1992 Plan, if it had been the last company to employ the individual under a UMWA labor agreement. 26 U.S.C. § 9712(d)(3). The Act further provided that any "related

2

person" to the retiree's last employer was jointly and severally liable for the required premiums. 26 U.S.C. § 9712(d)(4).

On April 4, 1995, the 1992 Plan approved Mr. Marcum's application for enrollment and began providing his health benefits, based on the fact that by letter dated February 8, 1995 the UMWA Pension Plan awarded Mr. Marcum a disability pension retroactive to September 1, 1988. By letter dated December 6, 2004, almost a decade later, counsel for the 1992 Plan informed Bibeau Construction that the 1992 Plan had determined it was a related person to Valley Services within the meaning of section 9701(c)(2) of the Coal Act, and demanded that it pay premiums to the 1992 Plan for Mr. Marcum and his dependent retroactive to February 1993. On February 1, 2006, the 1992 Plan filed this action asserting that Bibeau Construction is a related person to Valley Services, and that it is liable for thirteen years of past premiums, plus subsequent premiums as assessed.

The 1992 Plan's claim is not judicially cognizable and must be dismissed because it is untimely. Under the applicable six year statute of limitations the 1992 Plan was required to bring its claim that Bibeau Construction is a related person to Valley Services, and liable for payment of premiums, no later than April 2001, six years after it enrolled Mr. Marcum and began providing his health care benefits. Indeed, even if the Court were to conclude that the April 4, 1995 date when the 1992 Plan enrolled Mr. Marcum is not the date its claim against Defendant accrued, the fact Plaintiffs waited eleven years to file this action against Bibeau Construction merits dismissal under the equitable doctrine of laches.

3

**STATEMENT OF MATERIAL FACTS AS TO WHICH BIBEAU CONSTRUCTION
CONTENDS THERE IS NO GENUINE ISSUE[1]**

A.    **Arthur Marcum, Jr.'s Eligibility to Receive Benefits from the 1992 Plan**

1.    Arthur Marcum, Jr. performed classified service for Valley Services in West Virginia between May 1978 and September 25, 1979, during the term of the 1978 NBCWA. On September 25, 1979, at age 28, he injured his back when he jumped from a bull dozer he was operating. UMWA 1992 Benefit Plan's Disability Summary – Initial Review (attached hereto as Exhibit 1).

2.    Shortly thereafter, Valley Services permanently ceased its operations and laid off its workforce. Declaration of Ovila L. Bibeau (attached hereto as Exhibit 2) ¶ 2. The UMWA Pension Plan recorded an out-of-business date of November 10, 1979 for Valley Services, less than two months after Mr. Marcum's injury. UMWA Health and Retirement Funds "No Longer in Business Letter" (attached hereto as Exhibit 3).

3.    Valley Services wound up its affairs, paid off creditors, and formally dissolved in the early 1980s. Exhibit 2 ¶ 4. At the time Valley Services ceased business, it was owned by Ovila L. Bibeau and his (then) wife, who had acquired the company in or around 1974. Exhibit 2 ¶ 2.

4.    Mr. Marcum eventually recovered from the injury he sustained while employed by Valley Services and re-entered the workforce. In 1982 he worked in a non-classified position as a parts runner for another coal company, and in 1985 and 1986 he worked as a carpenter's helper and a plumber's helper. His last reported earning were in 1988. Exhibit 1; Social Security Administration Wage Records for Arthur Marcum (attached hereto as Exhibit 4).

---

[1] Defendant submits this Statement of Undisputed Material Facts ("Facts") as required by Local Civil Rules 7(h) and 56.1

5.     Mr. Marcum eventually applied for and was awarded Social Security Disability Insurance under the Social Security Act.   According to the Social Security Administration ("SSA"), the date of onset of his total disability was August 31, 1988.  Exhibit 1.

6.     The 1978 NBCWA provided that "A miner who becomes permanently and totally disabled as a result of a mine accident after the effective date of this Agreement will become eligible for pension benefits . . . ."  1978 NBCWA, Article XX, Health and Retirement Benefits at 119 (relevant portions of the 1978 NBCWA attached hereto as Exhibit 5) at 119.  For reasons unknown, Mr. Marcum did not apply for a disability pension from the UMWA Pension Plan until July 1994.

7.     By letter dated February 8, 1995, Kyu W. Lee, Assistant Director of Eligibility Services for the UMWA Health & Retirement Funds, informed Mr. Marcum that his UMWA disability pension had been approved, retroactive to September 1, 1988.  Letter dated February 8, 1995 from the UMWA Health and Retirement Funds to Arthur Marcum, Jr. (attached hereto as Exhibit 6).  The UMWA Pension Plan concluded that Mr. Marcum's SSA award was causally linked to the back injury he sustained in 1979 while employed by Valley Services.  Exhibit 1.  In his February 8, 1995 letter Mr. Lee also advised Mr. Marcum that he might be eligible for health benefits from Valley Services.

In addition to your pension, you and your dependents may be eligible for health benefits.   To determine your eligibility for these benefits, contact the last signatory company that employed you in a classified job.  According to our records, that company was VALLEY SERVICES INC; we have sent a copy of this letter to notify them that they may be responsible for your benefits.

Exhibit 6.

8.     Two months later, by letter dated April 4, 1995, Mr. Lee notified Mr. Marcum that his application for retiree health benefits coverage from the 1992 Plan had been approved,

but that his last signatory employer, Valley Services was "no longer in business" and it was "financially unable to provide health benefits." The letter advised Mr. Marcum that he would be receiving a Health Services Card and that the 1992 Plan would pay his medical bills until the 1992 Plan could identify a related company to defunct Valley Services.

> [A] company related to [Valley Services, Inc.], or a successor company may still be liable to provide those benefits. The Benefit Plan may seek to have such company reinstate benefits payments, and if successful, you will be notified and your Health Services Card will expire.

Letter dated April 4, 1995 from the UMWA Health and Retirement Funds to Arthur Marcum, Jr. (attached hereto as Exhibit 7).

9.    No later than April 4, 1995, the 1992 Plan knew that Valley Services could not pay premiums to cover the 1992 Plan's cost of providing benefits to Mr. Marcum and his dependent child, and knew that the 1992 Plan must identify a related person to pay premiums.

10.    Since Mr. Marcum's pension was effective retroactive to 1988, the 1992 Plan was obligated to pay for health care costs he incurred on and after February 1, 1993, the date the 1992 Plan was established under the Coal Act. Beginning with his enrollment on April 4, 1995, and during the ensuing six years, the 1992 Plan paid more than $4,000 in medical bills for Mr. Marcum and his dependent child. Plaintiffs' Response to Defendant Bibeau Construction Company, Inc.'s First Set of Interrogatories (attached hereto as Exhibit 8) at 11.

11.    The 1992 Plan had in its possession at all times in and after 1995 an information sheet for Valley Services which stated that the company was owned by O.L. Bibeau, and listed its telephone number as (914) 735-9535. Appendix to the National Bituminous Coal Wage Agreement of 1978 for Valley Services, Inc. (attached hereto as Exhibit 9).

12.    Valley Services and Bibeau Construction had the same telephone number. If the Plaintiffs had called the phone number provided for Valley Services anytime before December

2000, when the area code was changed from 914 to 845, the call would have been answered "Bibeau Construction". Other than the area code change, the phone number has remained the same. Exhibit 2  ¶¶ 8 – 9; Declaration of Karin C. O'Keefe dated September 9, 2007 (attached hereto as Exhibit 10) ¶¶ 3, 5.

13.    The 1992 Plan took no steps whatsoever to identify a related person to Valley Services until February 2001.    Plaintiffs' Supplemental Responses to Defendant Bibeau Construction Company, Inc.'s First Set of Interrogatories and First Request for Production of Documents (attached hereto as Exhibit 11).

14.    In 2001, Plaintiffs identified Ovila L. Bibeau as an owner of commercial property located in New York within five miles of the Spring Valley, New York address listed on Valley Services' information sheet.  UMWA Health and Retirement Funds InterOffice Correspondence dated February 4, 2001 regarding Valley Services, Inc. searches (attached hereto as Exhibit 12); Exhibit 2 ¶ 8. The Plan waited another three years to follow-up on that connection.

**B.    Bibeau Construction's History and the Lawsuit**

15.    Bibeau Construction never signed a UMWA coal wage agreement, never conducted business in the coal industry, never employed Arthur Marcum, and never received any financial benefit from Valley Services. Exhibit 2 ¶¶ 6 - 7.

16.    Bibeau Construction has operated continuously for the past thirty years in New York State, at all times making its headquarters in Rockland County, New York.  Its current headquarters in Nanuet are not more than 5 miles from its initial headquarters in Spring Valley, Rockland County.  It has held itself out to construction industry clients and the public using the same local phone number during this entire period. Only the area code was changed in December 2000. Exhibit 2 ¶¶ 6, 8.

7

17.     The 1992 Plan's December 6, 2004 letter addressed to Ovila L. Bibeau, CEO, Bibeau Construction, was the first notice the Plaintiffs ever provided to Defendant asserting that it was a related person to Valley Services, and demanding payment of premiums for Arthur Marcum and his dependent child. UMWA Health and Retirement Funds Letter dated December 6, 2004 to Ovila L. Bibeau and Pete Bibeau regarding Valley Services, Inc. – UMWA 1992 Benefit Plan Per Beneficiary Premiums (attached hereto as Exhibit 13).

18.     Through December 31, 2006, the 1992 Plan spent $36,127.25 to provide benefits on behalf of Mr. Marcum and his dependent daughter. Exhibit 8 at 11. For the same period, the 1992 Plan seeks premiums in the amount of $112,689.16. Calculation of Monthly Per Beneficiary Premiums Due at December 15, 2006 and for Subsequent Month for Valley Services, Inc. (attached hereto as Exhibit 14).

**C.      The Coal Act**

19.     The Coal Act established two plans to provide health benefits to certain retired UMWA coal miners. The UMWA Combined Benefit Fund ("Combined Fund"), established in subchapter B of the Coal Act, 26 U.S.C. §§ 9702-9708, covers all individuals who were eligible for and receiving benefits from the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan on July 20, 1992. *See* 26 U.S.C. § 9703(f)(1) (defining "eligible beneficiary"). Mr. Marcum's UMWA disability pension was retroactive to 1988. Had he applied for his pension prior to 1992 he would have been enrolled in the Combined Fund, because he would have been receiving retiree health benefits from the UMWA 1974 Benefit Plan on July 20, 1992.

20.     Because Mr. Marcum was not actually receiving benefits from the UMWA 1974 Benefit Plan on July 20, 1992, he could only be enrolled in the 1992 Plan, not the Combined Fund. *Fawn Mining Corp. v. Hudson*, 80 F.3d 519, 520 (D.C. Cir. 1996) ("All other eligible

[Coal Act] retirees are covered in the second benefit plan created by the Act, the '1992 Plan.'"). *See also* 26 U.S.C. § 9712(b)(1).

21.    The 1992 Plan charges a larger per-beneficiary premium than the Combined Fund. The 1992 Plan currently charges an annualized per-beneficiary premium of $6,648.00, whereas the Combined Fund currently charges an annual per-beneficiary premium (which is set by statute) of $3,360.71. Had Mr. Marcum applied for his disability pension promptly, and qualified for the Combined Fund, the total premiums attributable to him and his dependent child through December 31, 2006 for the same benefits would have been $70,417.74, rather than $112,689.16. Declaration of W. Gregory Mott (attached hereto as Exhibit 15) ¶ 5.

22.    In December 2006 Congress amended the Coal Act to provide that beneficiary assignments to companies that did not sign the 1988 NBCWA (such as Valley Services) would be withdrawn effective October 1, 2007. 26 U.S.C. § 9706(h), as amended by the Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, § 212(a)(3), 120 Stat. 2922, 3025 (2006). Thus, had Mr. Marcum applied for his UMWA pension timely and been enrolled in the Combined Fund, effective October 1, 2007 he would not be assignable to any former employer.

23.    Section 9712(d)(4) of the Coal Act, 26 U.S.C. § 9712(d)(4), incorporates the "related person" definition to impose joint and several liability for a last signatory employer's premium obligation to the 1992 Plan. Section 9701(c)(2)(A) defines "related person" to encompass members of a controlled group of corporations, including businesses under common control with the signatory operator. 26 U.S.C. § 9701(c)(2)(A)(i-iii). The Coal Act tests "related person" status as of a bright line date – July 20, 1992 – but if the last signatory operator was "no longer in business" as of July 20, 1992, related person status is determined "as of the time immediately before such operator ceased to be in business." 26 U.S.C. § 9701(c)(2)(B).

24.    The 1992 Plan is required to provide benefits to all individuals who are eligible for enrollment, regardless of whether the Trustees identify a last signatory operator or a related person to pay premiums.  26 U.S.C. § 9712(b).  Mr. Marcum's health benefits will not be affected by the outcome of this case.

## STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure allows the court to grant summary judgment "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  It is an integral part of the Federal Rules designed "'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  The non-movant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986), and the mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient.  *Id.* at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'general issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).  The material facts of this case are not in dispute.  The only questions to be resolved are strictly issues of law; therefore, summary disposition is appropriate.

## ARGUMENT

### A.    Plaintiffs' Lawsuit is Time-Barred

Plaintiffs filed this suit long after the limitations period expired.  As regards the statute of limitations for bringing claims under the Coal Act, section 9721 provides that

> The provisions of section 4301 of the Employee Retirement Income Security Act of 1974 shall apply to *any claim arising out of an obligation to pay any amount required to be paid by this chapter* in the same manner as any claim arising out of an

>       obligation to pay withdrawal liability under subtitle E of title IV of
>       such Act.  For purposes of the preceding sentence, a signatory
>       operator and related persons shall be treated in the same manner as
>       employers.

26 U.S.C. § 9721 (*emphasis added*).

>   ERISA section 4301(f) states

>>      (f) Time limitations. An action under this section may not be
>>      brought after the later of –
>>        (1)  6 years after the date on which the cause of action arose, or
>>        (2)  3 years after the earliest date on which the plaintiff acquired
>>      or should have acquired actual knowledge of the existence of such
>>      cause of action; except that in the case of fraud or concealment,
>>      such action may be brought not later than 6 years after the date of
>>      discovery of the existence of such cause of action.

29 U.S.C. § 1451(f).  For purposes of this case, 29 U.S.C. § 1451(f)(1) establishes a six year

limitations period.  This means that Plaintiffs were required to bring their action no later than

May 2001, based on a premium delinquency that first arose in April 1995 and became due on

May 15, 1995. 29 U.S.C. § 1451. (Premiums are due on the 15th of the month). *See* Exhibit 14.

Section 9712(d) of the Coal Act specifies that a last signatory operator "shall pay the

monthly per beneficiary premium under paragraph (1)(B) for each eligible beneficiary . . .

attributable to that operator." 26 U.S.C. § 9712(d)(3). Moreover, this section also specifies that

"any related person to such operator shall be jointly and severally liable with such operator for

any amount required to be paid by such operator under this section." 26 U.S.C. § 9712(d)(4).

Bibeau Construction therefore had a statutory obligation to pay, and the Plaintiffs had a statutory

obligation to collect premiums with respect to Mr. Marcum in May 1995. Moreover, Plaintiffs

clearly incurred an injury as soon as the 1992 Plan began paying for Mr. Marcum's benefits in

early 1995. There is no doubt that Plaintiffs could have filed in 1995 the very claim they assert

in the instant case. Therefore, Plaintiffs cause of action against Bibeau Construction accrued

11

when it enrolled Mr. Marcum in April 1995, and immediately began to pay for health care costs incurred by him and his dependent child.

The operative limitations period provided by 29 U.S.C. § 1451(f)(1) begins to run when the "cause of action" arises. This term has been defined as:

> (1)     a group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person . . . (2) a legal theory of a lawsuit.

*Black's Law Dictionary*, 214 (7th ed. 1999).

Plaintiffs' April 4, 1995 determination that Mr. Marcum met the eligibility criteria of the 1992 Plan was neither tentative or interlocutory in nature. Rather, it marked the consummation of Plaintiffs' decision making process on the matter. "The 1992 Plan determined, on April 4, 1995 that Mr. Marcum met the eligibility criteria of the 1992 Plan, as set forth in the Plan and in Section 9712(b)(2) of the Coal Act." Exhibit 7; Exhibit 8 at 9.

Plaintiffs' 1995 determination also was unquestionably one from which legal consequences flowed. Enrollment triggered an enforceable fiduciary relationship between Mr. Marcum and Plaintiffs and imposed a statutory duty on the 1992 Plan to pay his medical expenses. Had Plaintiffs refused or failed to pay for Mr. Marcum's health care costs in 1995, he could have immediately sued the 1992 Plan under ERISA for a declaration that he was entitled to health benefits in the amount of his unpaid medical bills. 29 U.S.C. § 1132(a). Immediately upon his being ruled eligible, and in each successive year thereafter, the 1992 Plan expended its own money to provide medical benefits to Mr. Marcum. Exhibit 8 at 11.

Enrollment also signaled Plaintiffs' final decision to attribute in 1995 premium responsibility for the lifetime health benefits of Mr. Marcum (and his dependent) to a last signatory coal operator and its related party. The related party is treated through legal fiction as

12

if it employed the enrollee (and any dependent) through the single employer doctrine written into the Coal Act. The Coal Act does not say that premium payment responsibility accrues only upon discovery of the related party. Rather, careful reading of section 9712(d) underscores that premium payment responsibility springs from the 1992 Plan beneficiary's enrollment. The Coal Act thus specifies that "in business" last signatory employers and "in business" related parties become immediately and statutorily obligated to finance health benefits coverage. Although it is incumbent upon the 1992 Plan to seasonably notify them of the premium amount, section 9721 of the Coal Act specifies that the provisions of ERISA 4301 (which houses the applicable statute of limitations) "shall apply to any claim arising out of an obligation to pay any amount required to be paid *by this chapter*." (emphasis added). Thus, the claim arises and exists under the statute, without regard to when the Plaintiffs get around to providing a notice.

By way of illustration, in *Adventure Resources, Inc. v. Holland*, 193 B.R. 787 (S.D. W.Va. 1996), *aff'd*, 137 F.3d 786 (4th Cir. 1998), the Court examined when the 1992 Plan comes to have an enforceable claim, an issue of considerable significance in that bankruptcy proceeding. The Court began its analysis noting as follows:

> The 1992 Plan enrolls beneficiaries upon determining they are eligible for coverage. The Coal Act imposes an ongoing duty on the last signatory operator and its related persons to pay annual prefunding premiums and monthly per-beneficiary premiums to the 1992 Plan *for every month the 1992 Plan provides health benefits to the operator's retirees.* 26 U.S.C. § 9712(d)(1)(B).

193 B.R. at 791 (emphasis added). After recognizing that section 9712 premium obligations are taxes, the Court explained:

> [A] tax liability is generally 'incurred on the date it accrues, not on the date of the assessment or the date on which it is payable.' . . . . In common parlance, accrual occurs when an obligation 'come[s] into existence as an enforceable claim.'

13

193 B.R. at 795 (quoting *Webster's Third New International Dictionary* 13).   Applying the

accrual definition, the Court, at the 1992 Plan's urging, concluded:

> When Adventure ceased the maintenance of its § 9711 plan in 1994, however,
> there arose in the [1992 Plan] 'an enforceable claim' for per beneficiary
> premiums and the premiums thus accrued on that date.

*Adventure*, 193 B.R. at 795-96; *cf. United States Steel Corp. v. Astrue*, No. 06-15255, 2007 U.S.

App. LEXIS 19334, at *17 (11th Cir. Aug. 15, 2007) ("Appellants have suffered a final agency

action that has adversely affected them, as they have been obliged to pay [Combined Fund]

premiums since the initial assignment. . . .   Thus, we hold that the statute of limitations for

Appellants' claim ran from the date of the initial assignment.").

   Plaintiffs cannot defend on the basis that they did not know in 1995 that the 1992 Plan

had a right to assess Bibeau Construction premiums.   In April 1995, the Plan advised Mr.

Marcum that his "last signatory employer" was defunct and could not finance his health benefits

coverage, and stated that the 1992 Plan would look for a "related person" to defunct Valley

Services to pay for his health benefits.   Inexplicably, and in absence of any diligence let alone

reasonable diligence, Plaintiffs sat on their hands throughout the remainder of 1995, throughout

1996, 1997, 1998, 1999, and 2000, while they paid thousands of dollars to cover Mr. Marcum's

health care costs. As demonstrated below, had 1992 Plan officials so much as picked up the

phone any time during this period and called the phone number listed on Valley Services'

information sheet, which was in their possession, they would have identified Bibeau

Construction as a related party to defunct Valley Services.

   Had Plaintiffs made this call, Valley Services' connection to Bibeau Construction would

have been immediately obvious.   The signature page of Valley Services' 1978 NBCWA,

executed by the UMWA District President, and countersigned by O. L. Bibeau in his capacity as

President of Valley Services, listed a Rockland County, New York address for Valley Services, Inc. The Appendix to Valley Services' agreement similarly identified "O. L. Bibeau, President" as the "OPERATOR" of Valley Services and provided the same Rockland County address, along with a telephone number with a New York area code (914). Exhibit 9).[2]

Plaintiffs had other information in their possession pointing the way to Defendant as well. Mr. Marcum's 1979 IRS Form W-2, which he provided to the UMWA Health & Retirement Funds in October 1994 in support of his UMWA pension application, listed the same Rockland County address for Valley Services. IRS Form W-2 for Arthur Marcum, Jr. (attached hereto as Exhibit 17). The "No Longer in Business Letter" that the UMWA Health & Retirement Funds required Valley Services to complete upon its ceasing operations was sent to the Rockland County address via certified mail/restricted delivery in May 1980. The "No Longer in Business Letter" was signed on May 20, 1980 by Dorothy S. Bibeau in her capacity as Vice President of Valley Services, in the presence of a Rockland County notary. Exhibit 3. The Health Services Card Application and Maintenance Form received from Mr. Marcum on February 23, 1995 identified the last signatory employer as Valley Services and identified the "Address of Last Coal Employer" as "Spring Valley, NY, NY." UMWA Health and Retirement Funds Health Services Card Application and Maintenance Form (attached hereto as Exhibit 18).

As the documents in Plaintiffs' custody and control during this period make clear (i) Valley Services had long been defunct and Plaintiffs knew it; and (ii) the last operators/principals

---

[2]  The Mine Safety and Health Administration ("MSHA") was in possession of information that clearly established Defendant's relationship to Valley Services. *See* MSHA Data Retrieval Report Selection Page for Valley Services, *available at* www.msha.gov/drs/drshome/htm (attached hereto as Exhibit 16), which states that the current controller of Valley Services was Bibeau Construction. A telephone call or visit to MSHA's office likely would have revealed this information. Plaintiffs additionally could have phoned the New York State Corporations Division and been provided with information concerning companies bearing the distinctive name of the Defendant's owner and president.

of Valley Services were named Bibeau and they resided in and/or managed Valley Services from Rockland County, New York.

The 1992 Plan nevertheless waited a decade to file suit alleging that Bibeau Construction was a related person to Valley Services, and offers no cognizable or excusable grounds for the inordinate and unconscionable delay. It is evident that Bibeau Construction has not engaged in self-concealing conduct designed to escape or frustrate the Trustees' claim. Indeed, had Plaintiffs so much as picked up the phone and dialed the phone number appearing on the Appendix to Valley Services' 1978 NBCWA, *see* Exhibit 9, before the December 2000 area code change they would have been greeted by a receptionist saying "Bibeau Construction." Exhibit 2 ¶¶ 8 – 9; Exhibit 10 ¶ 5. Locating Bibeau Construction was that simple.[3] By their own admission, Plaintiffs did not pick up the file until February 2001, two months after the effective date for the new area code. Exhibit 10 at 4-5.

The Coal Act contains an inflexible date for when a last signatory operator's (and related person's) obligation to make health benefit contributions for a particular retired UMWA miner (and his dependents) arises. ("Any last signatory operator . . . shall pay the monthly per beneficiary premium under [section 9712(d)(1)(B)] for each eligible beneficiary described in [section 9712(d)(1)(B)] attributable to that operator."). There is no basis for equitable tolling under these circumstances. Plaintiffs had all the information they needed at their fingertips

---

[3] It is a matter of record that Rockland County got a replacement area code in June 2000, but the 914 area code Bibeau Construction had been using for decades remained in effect until December 2000. ("Once 845 takes effect in June [2000], customers will be given until Dec. 4 [2000] to get used to the new code. The six-month permissive period will allow callers to temporarily ignore 845, but they will be reminded to get in the habit of dialing those digits." December 10, 1999 News Article from The Journal News (Westchester County, NY) With Headline "845; County gets new area code in June." (attached hereto as Exhibit 19).

beginning in 1995, and with the exercise of any diligence at all could have discovered Defendant's related person connection to Valley Services.

Statutes of limitation protect important social interests in certainty, accuracy and repose. Triggering the running of the six-year limitations period in this context to the date of a demand letter (December 4, 2004), rather than the date of enrollment (April 1995) when the 1992 Plan suffered injury and Valley Services/Bibeau Construction's premium funding obligation accrued, has an extraordinarily blindsiding and highly prejudicial effect. Indeed, the very purpose of the statute of limitations Congress included in the Coal Act (borrowed from ERISA) is to place an outside limit on the time the 1992 Plan may pursue the related person liability that Congress also provided for in the Coal Act. Congress allowed Plaintiffs a reasonable six year period to pursue a claim against Defendant based on its status as a related person to Mr. Marcum's employer, and the 1992 Plan exceeded it in this case by nearly five years.

**B.    Plaintiffs' Extraordinary Delay and the Accompanying Prejudice to Bibeau Construction Warrant the Court's Invoking the Equitable Doctrine of Laches**

The longstanding equitable doctrine of laches "stems from the principle that 'equity aids the vigilant, not those who slumber on their rights,' and is designed to promote diligence and prevent enforcement of stale claims." *Powell v. Zuckert*, 366 F.2d 634, 636 (D.C. Cir. 1966) (quoting 2 Pomeroy, *Equity Jurisprudence* § 418 (5th ed. 1941)). *See also Black's Law Dictionary* 875 (6th ed. 1990) ("Doctrine of laches is based upon maxim that equity aids the vigilant and not those who slumber on their rights. It is defined as neglect to assert a right or claim, which taken together with lapse of time and other circumstances causing prejudice to the adverse party, operates as bar in court of equity."). The elements of a laches defense are: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party

17

asserting the defense." *Costello v. United States*, 365 U.S. 265, 282 (1961). "The prejudice normally contemplated in applying laches . . . stems from such factors as loss of evidence and unavailability of witnesses, which diminish a defendant's chances of success." *Powell*, 366 F.2d at 638.

In *Powell*, Judge Wright reversed a trial court grant of summary judgment based on laches after finding that "[n]o attempt has been made to controvert appellant's proof" that he was "at all times diligent." *Id.* at 638. "Appellant, therefore, is not a person who has slept on his rights." *Id.; Bender v. Jordon*, 439 F. Supp. 2d 139, 179 (D.D.C. 2006) ("Given the secrecy with which Defendant Directors operated . . . it is no surprise that it took Mr. Bender several months to untangle defendants' transactions and craft a complaint. It can hardly be said that Mr. Bender slumbered on his rights"). In marked contrast, in the instant case, as developed below, both elements are present. There is a demonstrable lack of diligence, *i.e.*, inexcusable delay, on the part of Plaintiffs, and resulting prejudice by the delay.

In the first instance, the underlying basis for the liability Plaintiffs assert in this case challenges commonsense notions of fairness and equity. Bibeau Construction is being called to pay premiums back to February 1993, and prospectively for the lifetime of a miner it never employed. The demand arises not because Defendant shared overlapping ownership with Valley Services in 1992 when the Coal Act passed, but because of common ownership in 1979 when Valley Services went out of business. At no time did Bibeau Construction benefit from Mr. Marcum's labor, or from its corporate affiliation with Valley Services. The two companies filed separate federal and state income tax returns, and never shared in the profits or offset the losses of Mr. Marcum's employer. Indeed, Valley Services itself had no obligation to provide benefits to any employee or retiree beyond the term of its 1978 NBCWA. Thus, Bibeau Construction is

not even being asked to pay obligations owed by an affiliate which the affiliate failed to honor at the time it went out of business.    Prior to Plaintiffs' December 6, 2004 letter, Bibeau Construction had no basis for anticipating that it could be called to pay a monthly per-beneficiary capitated tax assessed by trustees of a private benefit plan to finance retiree health benefits for a person who worked briefly for a sister company that had gone out of business a quarter of a century earlier.

Bibeau Construction was substantially and specifically prejudiced in other ways by having to wait twelve years after enactment to even find out who Mr. Marcum was.    Plaintiffs first notified Bibeau Construction in December 2004 that it must pay (within twenty days) an $86,000 accelerated demand for monthly Coal Act premiums dating back to February 1993 for this Valley Services' disabled pensioner whom Plaintiffs had enrolled a decade earlier. Moreover, Plaintiffs explicitly seek to capitalize on their own delay backfilling their Complaint with a claim for interest and liquidated damages "from the date [section 9712(d) premiums] became due and owing."  Complaint at 4.  The bulk of the interest naturally was generated in the decade prior to the 1992 Plan's mailing their notice and demand to Bibeau Construction in December 2004. *See* Complaint at 4.  Here financial prejudice plainly results from the delay in notice between 1995 and 2004.

This substantial passage of time has also effectively barred Bibeau Construction from challenging the substantive grounds for the UMWA Pension Plan's 1995 decision to award Mr. Marcum a disability pension (which is the reason he was deemed eligible for benefits from the 1992 Plan).[4]    This is significant because Mr. Marcum is receiving benefits as a disability

---

[4]  The 1978 NBCWA provides that "[t]he Trustees shall promptly investigate and determine the eligibility or ineligibility of any beneficiary whose right to receive benefits from the Trusts has been challenged by an . . . Employer.".  Exhibit 5 at 112.

pensioner, not because he is a pensioner who worked for decades in UMWA signatory coal mines. As noted, although he hurt his back in September 1979, he worked thereafter and was not awarded Social Security Disability Insurance benefits until August 1988. Under the 1978 NBCWA, a disability pension may be awarded only where the miner becomes permanently and totally disabled <u>as a result of a mine accident</u>. Exhibit 5 at 119. By December 2004, however, Bibeau Construction no longer had the means to challenge the UMWA Pension Plan's pivotal 1995 finding of a claimed "causal link" between Mr. Marcum's September 1979 accident and the reasons that prompted SSA to consider him disabled effective September 1988. *See* Exhibit 1. Even with faded witness memories it might have been possible to challenge this causal link. However, in 2002, seven years after Mr. Marcum's enrollment, Ovila Bibeau instructed a cleaning crew to throw out virtually all corporate and personnel records relating to Valley Services' operations in the late 1970s, including contemporaneous corporate records that potentially could have provided an evidentiary basis for challenging Mr. Marcum's eligibility, because they had been damaged when his basement was flooded.

Additionally, a 1992 Plan beneficiary is *not* eligible for health benefits coverage in any month in which he is regularly employed at an earnings rate equivalent to at least $1000. *See* ROD Case No: 98-043 (June 30, 2003) *available at* www.UMWAFunds.org/RODs_DATA/98rods/98-043.doc ("Since September 2002, the Complainant has been ineligible for health benefits coverage because his monthly earnings exceed the earnings limitation of $1,000 under the Respondent's 1998 Employer Benefit Plan."). However, Plaintiffs never sought to verify Mr. Marcum's continuing eligibility for health care coverage under this earnings limitation. Exhibit 8 at 10; UMWA Health and Retirement Funds letter dated December 2004 to Arthur Marcum, Jr. regarding Health Services Card (attached

hereto as Exhibit 20). The prospect of Mr. Marcum's earning $1,000 a month in and after 1995, even if intermittently, is certainly plausible. He was just forty-five years old when he was enrolled in the 1992 Plan in 1995, and had performed carpentry, plumbing and landscaping work for several years *after* his 1979 accident. The 1992 Plan's eleven year delay in asserting its claim against Bibeau Construction has effectively precluded Defendant from obtaining information to mount an eligibility challenge for any or all of this period.

The equities in this matter are also strongly flavored by Mr. Marcum's substantial delay in applying for his UMWA pension after being awarded Social Security Disability Insurance benefits effective August 31, 1988. Had he received his pension prior to July 20, 1992, he would have been enrolled in the Combined Fund rather than the 1992 Plan, and the amount of premiums in issue through December 31, 2006 would be $70,417.74 rather than $112,689.16. Exhibit 15 ¶ 5. Significantly, had he been timely enrolled in the Combined Fund, any responsibility attributable to Bibeau Construction based on his employment with Valley Services would be winding down. This is because in December 2006 the Coal Act was amended to provide that the assignment of premium liability for Combined Fund beneficiaries to companies that were not signatory to a 1988 NBCWA will be withdrawn effective October 1, 2007. 26 U.S.C. § 9706(h)(3). (Mandating the Commissioner "revoke all [Combined Fund beneficiary] assignments to persons other than 1988 agreement operators for purposes of assessing premiums for plan years beginning on and after October 1, 2007.") *See* 26 U.S.C. § 9706(h)(1)(A).

Mr. Marcum has received all benefits to which he is entitled under the statute since 1995. Dismissing this action will not change that situation, nor will it affect his benefits in the future.

## CONCLUSION

For the foregoing reasons, the Court should enter Summary Judgment in favor of the Defendant.

Respectfully submitted,

_____/s/_____
John R. Woodrum
D.C. Bar # 933457
OGLETREE, DEAKINS, NASH, SMOAK,
  & STEWART
2400 N Street, N.W.
Fifth Floor
Washington, D.C. 20037
Telephone: (202) 887-0855

*Attorney for Defendant Bibeau Construction
Company, Inc.*

5185027