IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL H. HOLLAND, MICHAEL W. BUCKNER, A. FRANK DUNHAM and ELLIOT A. SEGAL, as TRUSTEES OF THE UNITED MINE WORKERS OF AMERICA 1992 BENEFIT PLAN, )))))) | |
| Plaintiffs, ) | No. 1:06-cv-00178-RMU |
| v. ) | |
| VALLEY SERVICES, INC. ) | |
| and ) | |
| BIBEAU CONSTRUCTION COMPANY, INC., ) | |
| Defendants. ) | |

DEFENDANT BIBEAU CONSTRUCTION COMPANY, INC.'S
REPLY TO PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

Bibeau Construction Company, Inc. ("Bibeau Construction") demonstrated in its opening brief (hereinafter "R. 9 at __"), that the United Mine Workers of America 1992 Benefit Plan ("1992 Plan or "Plan") could have filed an action asserting that Bibeau Construction was a related party to defunct Valley Services, Inc. ("Valley Services"), jointly and severally liable for monthly premiums due the 1992 Plan under section 9712(d) of the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), 26 U.S.C. § 9712(d), beginning in May 1995. Plaintiffs, in the exercise of due diligence, could have filed an appropriate request for declaratory relief to establish Coal Act liability, see Fed. R. Civ. P. 57, or a collection case seeking a coercive remedy for unpaid premiums. See 29 U.S.C. § 1451(a)(1) ("A plan fiduciary . . . who is adversely

affected by the act or omission of any party under this subtitle with respect to a multiemployer plan . . . may bring an action for appropriate legal or equitable relief, or both."). In their opposition papers (hereinafter "R. 12 at __"), Plaintiffs have not denied or disputed that they could have done so.

This notwithstanding, Plaintiffs now insist that their Coal Act "cause of action would [sic] did not begin to accrue until the date on which the Plaintiffs' calculated the liability to the 1992 Plan, notified the assigned operator of its liability to the 1992 Benefit Plan **and** the assigned operator or related person failed to make the payment of [sic] the prescribed date." (R. 12 at 3-4) (emphasis in original). For the reasons set forth in Defendant's opening brief, as amplified below, Plaintiffs' revisionist accrual theory flies in the face of the plain language of section 9712, Plaintiffs' prior appellate pleadings before the U.S. Court of Appeals for the Fourth Circuit, their own internal recordkeeping reflecting monthly incurred premium liability, and general principles applicable to statutes of limitations. Moreover, it cannot be salvaged by fastening on the Court's distinguishable statements in *Bay Area Laundry & Dry Cleaning Pension Trust v. Ferbar Corp.*, 522 U.S. 192 (1997).

## ARGUMENT

### A. The Section 1451 Limitations Clock Triggered In 1995 Not December 2004.

The date the 1992 Plan sent Bibeau Construction notice of its claim, and the payment due date set out in that notice are here undisputed – respectively December 6 and December 26, 2004. The Coal Act itself, however, establishes that the legal obligation of a last signatory employer (and related party) to pay a premium to the 1992 Plan arises when a UMWA pensioner becomes an eligible beneficiary and begins receiving benefits from the 1992 Plan. This distinction was perhaps most succinctly pointed out by Plaintiffs themselves in a reply brief

urging the Court of Appeals for the Fourth Circuit to affirm a Coal Act claim accrual holding firmly rooted in principles generally applicable to statutes of limitation:

> Coal Act per beneficiary premiums are taxes.
>
> The determination of when a tax is incurred is guided by the federal . . . statute creating that liability. . . .
>
> '[A] tax liability is generally incurred on the date it accrues,' which is not necessarily the date of the assessment or the date on which it is payable.
>
> Accrual occurs when all the facts have occurred which render the tax enforceable.
>
> \*       \*       \*
>
> 1992 Plan per beneficiary premiums . . . are incurred on an on-going basis. The plain language of Section 9712 of the Coal Act reflects that those per beneficiary premiums are incurred each month that the last signatory operator and its related persons fail to provide health benefits to the operator's retirees, and the 1992 Plan provides health benefits to those retirees.

Response Brief of Cross-Appellees Reply Brief of Appellants, 1996 WL 33417556, at \*\* 13-14, 17, *Adventure Resources, Inc. v. Holland*, C.A. Nos. 96-1557, 96-1938 (4th Cir.) (hereinafter "1992 Plan *Adventure* Response Br. at __").[1] Plaintiffs' attempt, *see* R. 12 at 3 n.1, to cast off *Adventure Resources, Inc. v. Holland*, 193 B.R. 787 (S.D. W.Va. 1996), *aff'd*, 137 F.3d 786 (4th Cir. 1988), as an immaterial case in bankruptcy is as disingenuous as their attempt to peg the running of the six-year limitations period to a date "**no sooner than December 4, [sic] 2004,**" *id.*

---

[1] Section 9712 unequivocally provides that each last signatory operator is responsible for:

> [t]he payment of a monthly per beneficiary premium by each 1988 last signatory operator for each eligible beneficiary of such operator who is described in subsection (b)(2) and who is receiving benefits under the 1992 UMWA Benefit Plan.

26 U.S.C. § 9712(d)(1)(B). Significantly for purposes of the instant lawsuit, subsection (d)(3) makes this legal obligation applicable to former UMWA signatories (and related parties), which, like Valley Services, did not sign the National Bituminous Coal Wage Agreement of 1988.

at 4 (emphasis in original), is unavailing. It is a post-hoc litigating position that ignores the very claims accrual theory previously advanced and maintained by Plaintiffs themselves.

The 1992 Plan's December 6, 2004 letter is nothing more than a demand for unpaid premiums that had been accruing monthly for more than 10 years, and for which Plaintiffs, through the exercise of reasonable diligence, could have filed suit beginning in May 1995 (30 days after enrolling Mr. Marcum and not receiving the April 1995 premium (plus premiums incurred retroactive to February 1993 due to the Plan's back dating Mr. Marcum's date of enrollment to February 1993). Indeed Plaintiffs' own contemporaneous recordkeeping, first furnished to Bibeau Construction in discovery in 2007 rather than in a letter in the 1990s, meticulously tracks the monthly accrual of Coal Act premiums during the 1990s. This schedule, dated January 25, 2001, evidences a then $50,000 "delinquent" tax liability, the product of monthly premiums each month for the preceding 95 months. *See* Non Coal Wage Payment Status Detail Statement 1/25/01 (Copy attached hereto as Exhibit 1). Throughout the entire period broken out in monthly increments on this premium accrual schedule, Plaintiffs concededly failed to make any inquiry whatsoever as to whether there was a related party to delinquent Valley Services.

Under the circumstances presented, to hold that a cause of action does not accrue until a plaintiff learns the identity of controlled group members and makes a demand would run counter to the purposes of limitations periods, which is to prevent stale claims and allow potential defendants to be aware of and timely address their liabilities. While Plaintiffs assert that Defendant's dispositive motion disregards controlling Supreme Court precedent, *see* R. 12 at 1, the Court's recognition of the underlying purpose of a limitations period is particularly apt:

> Statutes of limitations are primarily designed to assure fairness to defendants. Such statutes 'promote justice by preventing surprises through the revival of

4

> claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.'

*Burnett v. New York Cent. R.R. Co.*, 380 U.S. 424, 428 (1965) (citation omitted). *See also Central States, Southeast & Southwest Areas Pension Fund v. Navco*, 3 F.3d 167, 171 (7th Cir. 1993), *rev'd on other grounds*, *Bay Area Laundry & Dry Cleaning Pension Trust v. Ferbar Corp.*, 522 U.S. 192 (1997) ("Does P's neglect to learn the identity of D's insurer extend indefinitely the time to commence an action against that insurer? . . . . Plenty of cases reject contentions that particular claims do not accrue until the victim finds out who can be obligated to pay."). *See also* 29 U.S.C. § 1104(a) ("[A] fiduciary shall discharge his duties with respect to a plan . . . with the . . . diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use. . . ."); (R.8, Ex. F) UMWA 1992 Plan Agreement and Declaration of Trust, Art. XI (9) ("[T]he Trustees shall exert every effort to enforce the obligations of such section in any case in which an individual becomes an Eligible Beneficiary by virtue of his or her failure to receive the coverage required . . . ").

**B.    Plaintiffs Misconstrue The Supreme Court's Decision In *Bay Area Laundry*.**

Plaintiffs' assertion that the Plan's December 6, 2004 letter to Bibeau Construction demanding payment of Valley Services' premiums back to 1993 is analogous to a pension plan's issuance of a notice of assessment of withdrawal liability is similarly unavailing. As the Court explained in *Bay Area Laundry*, a withdrawn employer can be under no legal obligation to pay withdrawal liability until the plan first creates a legal duty to pay by calculating the amount of assessment and issuing the employer a notice and installment payment schedule. Whereas MPPAA contains a detailed procedure that a pension plan must follow to convert a withdrawal

from the plan into a statutory obligation to make specific payments, *see* 29 U.S.C. § 1399, the Coal Act does not incorporate this MPPAA provision, and it contains no comparable process.

The 1992 Plan, must, of course, perform an administrative computation at the beginning of each year to determine the amount of the per-beneficiary premium operators must pay pursuant to section 9712(d)(1)(A), but, significantly, the amount of the premium is the same for all payors. *Compare Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 418 (1995) (describing withdrawal liability as resting on "highly complex calculations" and noting "MPPAA's lengthy charge-determination section, § 1391, sets forth rules for calculating a withdrawing employer's [individualized] fair share of a plan's underfunding . . . .") *with* 1992 Plan Agreement and Declaration of Trust Art. XI (3) ("[E]ach Last Signatory Operator that is not a last 1988 Last Signatory Operator shall pay a per beneficiary premium, which shall be set by the Trustees as of November 30 of each Plan Year . . . ."). Thus, the 1992 Plan premium is payable as soon as an Eligible Beneficiary is enrolled, in marked contrast to 29 U.S.C. § 1399 where a withdrawing employer's legal obligation is hinged to a detailed statutory procedure a pension plan must follow as a precedent to bringing the withdrawal liability into existence.

Plaintiffs' assertion that the December 6, 2004 letter is analogous to a withdrawal liability notice issued in accordance with 29 U.S.C. § 1399 is fallacious for other reasons as well. For example, since withdrawal liability does not exist until a plan issues a notice under 29 U.S.C. § 1399, no question of delinquent payments or interest on delinquent payments can even arise with respect to the period between the date of the withdrawal and the date of the assessment letter. Consequently, if the plan trustees do not promptly assess withdrawal liability, the plan will not collect interest for the period of the delay.

6

Here, however, the 1992 Plan sought "delinquent" premiums in its December 6, 2004 letter and in this case seeks interest and liquidated damages for all premiums that accrued since February 1993. Had the Plan's December 6, 2004 letter in fact been comparable to an assessment of MPPAA liability, there could be no demand for amounts prior to the date of the letter, nor could the 1992 Plan demand interest be paid with respect to any period predating the letter.

More fundamentally, however, the thrust of the Supreme Court's opinion in *Bay Area Laundry* was to assimilate limitations issues under MPPAA to the legal principles generally applicable to statutes of limitations. *See, e.g., Bay Area Laundry*, 522 U.S. at 200 ("Such a result [i.e., triggering the limitations clock upon the date an employer exits a multiemployer plan] is inconsistent with basic limitations principles, and we reject it."). It is evident that in the instant case, absent turning generally accepted accrual principals on their head, the date analogous to the accrual date for suing to enforce a withdrawal liability payment obligation, as established in *Bay Area Laundry*, is April 1995, when Mr. Marcum entered the 1992 Plan as an Eligible Beneficiary. *Compare Bay Area Laundry*, 522 U.S. at 201 ("The date of withdrawal cannot start the statute of limitations clock, because the MPPAA affords a plan no basis to obtain relief against an employer on that date.") *with* 1992 Plan *Adventure* Response Br., 1996 WL 33417556 at *17 ("[1992 Plan] per beneficiary premiums are incurred each month that the last signatory operator and its related persons fail to provide health benefits to the operator's retirees, and the 1992 Plan provides health benefits to those retirees"). *See also Joyce v. Clyde Sandoz Masonry*, 871 F.2d 1119, 1122 (D.C. Cir. 1989) ("the plan is 'adversely affected' (and thus a 'cause of action' arises) when the plan has not received payments which are due and owing.").

7

C.  **Plaintiffs' Failure To Locate Bibeau Construction Does Not Toll ERISA's Six-Year Limitations Period.**

Plaintiffs aver that its February 1, 2006 Complaint is not time barred per 29 U.S.C. § 1451(f)(2), because it was filed within 6 years after the date on which the 1992 Plan "acquired knowledge of the cause of action against Bibeau Construction due to the company's continued concealment of its liability, even after a demand and request for such information from Plaintiffs." (R. 12 at 7). The Seventh Circuit's claims accrual analysis in *Navco*, which the Supreme Court did not disturb in *Bay Area Laundry*, is both relevant and dispositive.

In *Navco*, certain companies withdrew from two multiemployer pension plans in January 1984 and the plans assessed them withdrawal liability. The participating employers did not pay any portion of their withdrawal liability due to the fact they were in bankruptcy. *Navco*, 3 F.3d at 170.

In 1991, after the six-year limitations period expired, the plans filed suit against Navco and an individual named Caldwell seeking to collect liability on the basis that they were jointly and severally liable. The plans argued that § 1451(f) was tolled until they had discovered the identity of Navco and Caldwell as possible members of the controlled group. The Court rejected the discovery date as the test for when the plans' cause of action accrued, noting that a claim accrues when the plaintiff knows of its injury. *Navco*, 3 F.3d at 171. As regards the limitations period established in ERISA, the court observed:

> Six years from the time of the injury, which § 1451(f)(1) affords as the minimum in every case, is generous. Congress appreciated that it might be difficult to ascertain the existence of a claim and track down persons liable under the Employee Retirement Income Security Act, a complex statute. . . . Pension funds and other persons holding claims under ERISA can use that six years to investigate. And if the potentially liable person engages in fraud or concealment, then § 1451(f)(2) affords six years from the discovery of the injury. The pension funds in our case, however, see the six years as a period of rest and recuperation. *Only after knowing that they have not been paid, and recognizing who is liable,*

8

*does the six years even start, the funds say. Yet if the time does not begin until the fund knows everything it needs to know – the existence of the debt, non-payment, and the identity (in relation to the employer) of control group members – why is the period so long?* Statutes of limitations provide time within which a person who knows of an injury may conduct the investigation needed to learn whether he has a legal claim, and, if so, who is liable. After completing the investigation, a pension fund should be able to make a demand (and, if necessary, file suit) in a matter of weeks. Allowing six years is understandable only on the assumption that the time was to be used to search for vital information. Both pension funds had ample time to explore questions about the Van Vorst corporate structure. They chose not to investigate and may not now insist that their own diffidence meant that the time did not even commence.

Any other approach would make the statute of limitations illusory.

*Id.* (emphasis added).

The situation here is remarkably similar, the principal difference being that the Plaintiffs in this case exceeded the limitations period by a substantially longer period than the plaintiffs in *Navco*. The 1992 Plan knew as early as April 1995, *see* R. 9, Ex. 7, that Valley Services was defunct, and that it would need to identify a related person to pay statutory premiums on behalf of Mr. Marcum and his dependent. Plaintiffs had a generous six years to identify any related person to Valley Services who could be called upon to pay those premiums. Indeed, as noted in Defendant's opening brief, had the Plan merely called the number listed on Valley Services' information sheet, which was at all times in their possession, they would have learned of the existence of Bibeau Construction.[2]

Plaintiffs' attempt to expand the limitations period by suggesting that Defendant engaged in fraud or concealment within the meaning of 29 U.S.C. § 1451(f)(2) is totally without merit for

---

[2] Bibeau Construction provided extensive documentation in its opening brief as to how the 1992 Plan could have diligently and timely discovered Defendant's existence. Plaintiffs dispute none of it, preferring instead to finesse the matter by asserting that "[t]he actions that the Defendant [sic] 'may' have taken to determine 'related persons' under the Coal Act are not relevant." (R. 12 at 5, n. 5).

9

numerous reasons. First, it is self-evident that Bibeau Construction had no reason to engage in such behavior, because even if officials of a non-coal, utilities construction company located in New York had carefully read (and understood) the 1992 Coal Act, they could not have known that the Coal Act might have any application to it. At the time Valley Services went out of business in 1979, Arthur Marcum had been receiving workers compensation for about two months, and there was no reason to believe his injury was disabling. Indeed, he thereafter resumed employment elsewhere, and it was not until 1995 that the UMWA Pension Plan decided he had become disabled in 1988, as a result of his 1979 accident at Valley Services. Bibeau Construction had no motivation to engage in concealing its connection to Valley Services and the Plaintiffs offer not one shred of evidence to suggest that it did.[3]

Plaintiffs chide Bibeau Construction for failing to come forward with information of any kind that cemented its related person status with Valley Services after receiving the Plan's December 6, 2004 letter. They claim that this is evidence of concealment sufficient to call the concealment exception to the discovery rule in section 1451(f)(2) into play. Plaintiffs have proffered no evidence or documents to support this assertion save their own self-serving characterization of communications between counsel. Plaintiffs do not suggest that they delayed filing this action under a tolling agreement, or even that Defendant asked the Plan to not file a complaint. Communications between the parties after December 2004 is immaterial in any event. By the time the Plan finally sent its December 6, 2004 letter nearly ten years had passed since Mr. Marcum had been enrolled (and nearly twelve years had elapsed since the February 1993 premium was due). It is incontrovertible that nothing occurred during this period that could

---

[3] Plaintiffs are deservedly sensitive about the fact they took no action whatsoever to identify a related person to Valley Services for nearly six years after enrolling Mr. Marcum. However, Plaintiffs' effort to shift the onus of their lack of diligence to Defendant's doorstep is simply indefensible.

10

support a claim that Defendant engaged in any action or behavior that would support application of the fraud or concealment exception.

**D.     Plaintiffs Are Not Entitled To Premiums That Have Accrued Since February 2000.**

Plaintiffs aver that, at a minimum, they are entitled to premiums that accrued during the six years prior to the date they filed this action. Their effort to salvage their Complaint based on each premium since 2000 constituting a new cause of action is unavailing for several reasons.

First, Plaintiffs rely on section 9721 of the Coal Act, which they quote as stating that the provisions of section 4301 of ERISA, 29 U.S.C. § 1451, "shall apply to any claim arising out of an obligation to pay an amount required to be paid by this chapter in the same manner as any claim arising out of an obligation to pay withdrawal liability under subtitle E of title IV of such Act. For purposes of the preceding sentence, **a signatory operator and related persons shall be treated in the same manner as employers**." (R. 12 at 2) (emphasis in original). Since this provision states that a related person is to be treated in the same manner as an employer for purposes of payment of withdrawal liability, Plaintiffs conclude that a new cause of action arises from the date each payment is missed (relying on *Bay Area Laundry*, 522 U.S. at 194.) A threshold problem with Plaintiffs' reliance on the boldfaced language is that it was deleted in amendments to this section enacted in December 2006.[4] Thus, to the extent Plaintiffs premise

---

[4]     Section 9721 of the Coal Act now reads:

The provisions of section 4301 of the Employee Retirement Income Security Act of 1974 shall apply, in the same manner as any claim arising out of an obligation to pay withdrawal liability under subtitle E of title IV of such Act, to any claim–

(1) arising out of an obligation to pay any amount required to be paid by this chapter; or
(2) arising out of an obligation to pay any amount required by section 402(h)(5)(B)(ii) of the Surface Mining Control and Reclamation Act of 1977 (30 U.S.C. 1232(h)(5)(B)(ii)).

Pub. L. 109-432, Div. C, Title II, Subtitle B § 213(b)(2), 120 Stat. 3027 (2006).

11

their claim on the direct statutory linkage of employers with premium obligation under the Coal Act to employers with withdrawal payment obligations under MPPAA, their reliance is misplaced.

Second, it must be noted that the holding in *Bay Area Laundry* regarding successive new causes of action was in the context of a single assessment of withdrawal liability which, by statute, is payable for up to 20 years under an installment schedule mandated by MPPAA. In contrast, Coal Act premiums, as the 1992 Plan urged in *Adventure Resources*, are not calculated on the basis of an upfront lump sum assessment payable in monthly installments.

Moreover, the threshold question here is whether Plaintiffs pursued and perfected their claim that Bibeau Construction is a related person to Valley Services during the six-year period of repose. The 1992 Plan has offered no explanation for its failure to take any action whatsoever during this period to locate Bibeau Construction, which at all times has operated openly and without guile, and, therefore, provides no basis for tolling. As in *Navco*, Plaintiffs here were afforded six years by statute to locate potentially related parties to Valley Services, Mr. Marcum's employer.

Plaintiffs' reliance on MPPAA as establishing the basis for a claim that each premium triggers a new limitation period actually undercuts their position that laches is unavailable in this case. In *Bay Area Laundry* the Court discussed many of the statutory procedures available to the plan (and the employer) which led to the Court's conclusion that a plan could not bring a claim until an employer missed an installment payment. Significantly, the Court noted that "if an employer believes the trustees have failed to comply with their 'as soon as practicable' responsibility [to calculate, schedule and assess liability] the employer may assert that violation as a laches objection at an arbitration contesting the withdrawal liability assessment." 522 U.S.

at 205; *see also Clyde Sandoz Masonry*, 871 F.2d at 1126-27. It would be an odd result indeed if a party could rely on laches to challenge an assessment of statutory withdrawal liability under MPPAA as untimely, but could not rely on laches as a basis for contesting an eleven-year delay in asserting liability for premiums under the Coal Act, where both are governed by the identical statute of limitations.

E.   **Assuming *Arguendo* Plaintiffs Have Until December 2010 To Sue For Contributions Accruing Monthly Since 1993, The 1992 Plan Is Chargeable, Within The Court's Discretion, With Laches Having Failed To Rebut Its Inexcusable And Substantially Prejudicial Delay.**

As developed above and in Defendant's opening brief, the 1992 Plan had ample basis for suit in 1995, but prejudicially slept on its rights for years before suing Bibeau Construction in 2006 for claimed monthly "delinquencies" dating to February 1993. Significantly, in their opposition papers Plaintiffs make no attempt to defend their inexcusable and indeed still unexplained failure to investigate and bring suit for more than a decade after the 1992 Plan was adversely affected by Mr. Marcum's 1995 enrollment. Plaintiffs also have made no attempt to rebut the accompanying prejudice to Defendant from this extraordinary lapse of time. *See* R. 9 at 19-21 (detailing same). Plaintiffs sidestep the elements of laches contending instead that laches is completely irrelevant, and barred as a matter of law by controlling precedent. However, in support of their position Plaintiffs fail to cite a single published decision of the District of Columbia Circuit Court of Appeals.[5]

---

[5]   The D.C. Circuit trial court rulings cited by Plaintiffs --*Combs v. Western Coal Corp.*, 611 F. Supp. 917 (D.D.C. 1985) (13-month delay between withdrawal (May 1982) and the plan's notice of assessment (June 1983)) and *Connors v. Hi-Heat*, 772 F. Supp. 1 (D.D.C. 1991) (refusing leave to amend to assert limitations or laches defense where contributing employer was dismissed as a matter of law on other grounds)-- do not have the force of precedent, and present markedly distinguishable facts.

Plaintiffs' assertion that "laches is simply unavailable to the Defendant in this action," *see* R. 12 at 9, relies principally on a Fourth Circuit Copyright Act case. But even in this discrete context – involving an explicit three-year copyright infringement limitations provision – the caselaw is anything but uniform and the defense of laches anything but thereby foreclosed in this Circuit.

By way of illustration, in *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007), a sister circuit court recently distanced itself from the Fourth Circuit's flat proscription on the application of laches in copyright infringement cases in *Lyons Partnership, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789 (4th Cir. 2001). The Sixth Circuit aligned itself instead with other circuit courts that have explicitly recognized that the doctrine of laches may, in a compelling case, serve to shorten the three-year period for filing a copyright infringement action. *See* 17 U.S.C. § 507(b) ("No civil action shall be maintained . . . unless it is commenced within three years after the claim accrued."). Construing the very same limitations provision as the Fourth Circuit, the Sixth Circuit recognized that in extraordinary circumstances, "the courts, as a co-equal branch of the federal government, must ensure that judgments never envisioned by the legislative drafters are not allowed to stand." *Chirco*, 474 F.3d at 236.[6]

---

[6] As regards the element of laches in this case, it is noteworthy that Congressional intent to discourage delinquencies stemming from signatory employers' failure to make contractually promised contributions to a multiemployer plan clearly does not support the 1992 Plan's demand for interest and for liquidated damages in the form of double interest back to Mr. Marcum's enrollment, when Plaintiffs concededly failed to even pick up the file until 2001 and then waited until 2004 to provide notice of the "delinquency." Therefore, assuming arguendo that the Court concludes a new limitations period arises with each monthly premium, and that laches cannot provide a bar to Plaintiffs' action for premiums that arose during the six years prior to the February 1, 2006 filing date in this case, it would still be within the Court's discretion to invoke laches as a bar to awarding the Plan judgment for interest (and liquidated damages) on premiums that accrued prior to December 2004, when Plaintiffs first informed Defendant of its related person claim. Confining interest and liquidated damages to premiums that came due after notice

Notably, just last Term, Chirco attempted (unsuccessfully) to urge review of the Sixth Circuit's laches holding by pointing to the same 1946 Supreme Court *dicta* that Plaintiffs hold out as controlling, *see* R. 12 at 8, and pointing to the appellate court split. Petition for Certiorari 2007 WL 1100128 at *i, *Crosswinds Communities, Inc. v. Chirco*, __ U.S. __, 127 S.Ct. 2975 (cert. denied June 18, 2007) ("Whether the acknowledged split among the United States Circuit Court of Appeals as to the availability of the laches defense in copyright infringement actions, due to the express statute of limitations of the Copyright Act, 17 U.S.C. §507(b), provides a compelling reason for consideration by the United States Supreme Court.") *with* R. 12 at 8 ("Multiple decisions of the Circuit Courts of Appeal preclude the Defendant from even raising laches as a defense in this case.").

The most critical flaw in Plaintiffs' consideration of the laches issue, however, is that they do not address a key reason why it must be taken into account in this case. Congress did not direct the 1992 Plan to enroll Mr. Marcum. That decision was made in 1995 solely by the 1992 Plan. Whether any particular person who was once employed in the coal industry can qualify for statutorily guaranteed retiree health benefits from the 1992 Plan turns on whether the individual in fact satisfies eligibility rules. The 1992 Plan assumes that, because some Plan official decided Mr. Marcum was eligible, that is the end of the matter. This tone-deaf approach, however, does not address the underlying question raised in Defendant's opening brief.

While eligibility determinations may be clear cut for UMWA pensioners who qualify based on satisfying threshold age and service criteria the matter is much more complicated where a miner claims eligibility based solely on disability. In this situation, a miner qualifies only if he

---

was given would conform Plaintiffs' relief to the purpose of the statutory provision authorizing such relief, without rewarding the Plan for the period of delay occasioned solely by its own failure to act timely.

15

becomes permanently and totally disabled as a result of a mine accident. As discussed in Defendant's opening brief (R. 9 at 19-21), whether Mr. Marcum's SSA disability award met this standard could be contemporaneously contested by the employer. Indeed, under the information available here, it is fair to ask whether the UMWA Pension Plan reviewer's 1995 decision on this point was correct.[7]

Laches in this case arises not just in the context of the 1992 Plan's delay in asserting its claim that Bibeau Construction is a related person to Valley Services, but with respect to the even more fundamental question of whether Mr. Marcum in fact satisfied the threshold eligibility requirement in the first instance. Obviously, Mr. Marcum was enrolled and has been receiving benefits, but that "fact" merely obscures the real inquiry, which is whether the Plan erred in the first instance by enrolling him. Laches is appropriately invoked because the extreme passage of time has effectively precluded Defendant from raising with the 1992 Plan issues which could have reduced[8] or eliminated entirely premiums Plaintiffs now seek in this case.

---

[7]    Plaintiffs accuse Defendant of making disparaging remarks about Mr. Marcum. (R. 12. at 6 n.6). This is not true. A review of Defendant's pleading makes it clear that the only issue raised by Defendant is the fact that Plaintiffs' unreasonable and prejudicial delay in filing this action has effectively precluded Defendant from any ability to challenge whether Mr. Marcum's 1979 job injury in fact caused his 1988 disability, and whether that accident nearly a decade prior caused his total and permanent disability. For example, did Mr. Marcum incur any injury to his back prior to 1979 or after 1979; to what extent was the 1988 disability attributable to a congenital or medical problem unrelated to the 1979 incident; were there medical records that would demonstrate a complete recovery from the 1979 accident? *See, e.g., Combs v. Retirement Plan for Hourly Employees of RAG American Coal – Lost Mountain*, 42 Fed Appx. 776 (6th Cir. Aug. 12, 2002) (upholding benefit denial where disability not solely due to mine injury); *Richard v. UMWA Health and Retirement Funds*, 851 F.2d 122 (4th Cir. 1988); *Odom v. UMWA Health and Retirement Funds*, 687 F.2d 843 (6th Cir. 1982).

[8]    Defendant also pointed out in its opening brief that the Plan has never monitored Mr. Marcum's post-enrollment earnings to verify that he in fact qualified for benefits each year since his enrollment. Plaintiffs' response was that they sent him an earnings verification letter. (R. 12 at 6 n.6). *See* Defendant's Summ. J. Mem., Exhibit 20. However, the letter relied on by

Under the Plaintiffs' theory of what it means for a claim to accrue, this case would be timely filed even had the Plan waited thirty years to contact Bibeau Construction and demand premiums retroactive to 1993, provided the Plan filed its case within six years after the thirty year delayed notice. Carrying Plaintiffs' position to its logical extension, the Court could not consider the doctrine of laches in an action to establish related person liability under the Coal Act even if the beneficiary had been deceased for the last ten years of this thirty six year period.

For the reasons set above and as more fully developed in Defendant's opening brief, Plaintiffs are chargeable with laches, the elements of inexcusable and prejudicial delay having been met and not rebutted.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant's Motion for Summary Judgment and dismiss the complaint in this case with prejudice because Plaintiffs filed their claim after the limitations period expired, and Plaintiffs' extreme delay has effectively precluded Defendant from contesting the factual basis for the Plan's eligibility determination in the first instance, thereby warranting dismissal of its claim under the doctrine of laches.

Respectfully submitted,

/s/
John R. Woodrum
D.C. Bar # 933457
OGLETREE, DEAKINS, NASH, SMOAK,
   & STEWART
2400 N Street, N.W., Fifth Floor
Washington, D.C. 20037
Telephone: (202) 887-0855

*Counsel for Defendant Bibeau Construction Company, Inc.*

---

Plaintiffs was not sent to Mr. Marcum until 2004, and merely asks if he has performed work in the coal industry. It does not ask whether he worked elsewhere. *See* R. 12 Ex. 20.